SAMUEL JOHNSON, in his individual
capacity,

       Plaintiff,

v.

UNIVERSITY HOSPITALS HEALTH
SYSTEM, INC., an Ohio non-profit
corporation,

       Defendant.

Case No. _____

Judge _____

JURY DEMAND

## COMPLAINT

**Demand for Jury Trial: Pursuant to Fed. R. Civ. P. 38(b) and Local Rule 7.03(b),
Plaintiff hereby demands trial by jury on all issues so triable.**

**COMES NOW** Plaintiff, Samuel Johnson ("Mr. Johnson" or "Plaintiff"), by and through

undersigned counsel, and for his Complaint against Defendant University Hospitals Health

System, Inc. ("UH Cleveland" or "Defendant") states as follows:

### NATURE OF THE ACTION

1.      This is a tortious interference action arising from malicious and improper conduct

committed by UH Cleveland in the spring of 2021, which resulted in Mr. Johnson's termination

from employment.

2.      Mr. Johnson, prior to UH Cleveland's conduct, was the chief executive officer of

WeCounsel Solutions, LLC d/b/a VisuWell ("VisuWell") for approximately three (3) years.

VisuWell is a rapidly growing technology company that serves the healthcare industry.

3.      In early 2021, UH Cleveland and VisuWell entered into negotiations for VisuWell

to function as UH Cleveland's principal telehealth software vendor. Mr. Johnson acted as

representative of VisuWell, dealing directly with UH Cleveland. These negotiations resulted in an executed vendor services agreement.

4.        In April 2021, an incomplete, edited, and out-of-context cell phone video clip spread across various social media platforms, including TikTok and Twitter (the "Video Clip" or the "Clip). The Video Clip only showed one (1) minute of an incident that had been developing for over one (1) hour. The inferences created by the Video Clip were false and deeply misleading.

5.        Many social media accounts commenting on the Video Clip falsely claimed that it showed Mr. Johnson instigating a confrontation with at least two LGBTQIA+ teenagers at a hotel. Many commentators falsely accused and implied that Mr. Johnson intentionally approached one of the teenagers to mock and harass the male teenager for wearing a dress. Many asserted and implied that the Clip shows Mr. Johnson intentionally going out of his way to approach the teenager wearing a dress. Some even falsely characterized Mr. Johnson as a "homophobic bully."[1]

6.        The truth of the matter, as will be explained in detail below, is that Mr. Johnson never committed any such conduct. Mr. Johnson, in truth, was at a hotel restaurant eating dinner with his family. Mr. Johnson and his family were regular patrons of that local restaurant. During his meal, the teenagers in question, along with others in their group, had been continually loud and disruptive, shouting obscenities and swears in the midst of a family restaurant. Mr. Johnson left his table to visit the restroom. When Mr. Johnson was walking back from the restroom, he was verbally attacked by the teenagers, who shouted and swore at him, exacerbating an already-noisy scene that had pre-existed his specific encounter with the teenager for over an hour. This incident will be alleged in detail, below, and will be referred to as the "April 24 Incident."

---

[1] https://twitter.com/eFab_Val/status/1387067562190573574 (last visited August 18, 2021). For purposes of this Complaint, all URL links and hyperlinks are hereby deemed incorporated by reference into this Complaint.

7.     UH Cleveland demanded that VisuWell's Board of Directors fire Mr. Johnson. UH Cleveland stated that if VisuWell did not fire Mr. Johnson, then UH Cleveland would terminate its telehealth vendor contract with VisuWell.  UH Cleveland demanded that VisuWell fire Mr. Johnson, despite the fact that Johnson's conduct did not give UH Cleveland grounds to claim VisuWell had breached its contract with UH Cleveland.

## PARTIES, JURISDICTION, AND VENUE

### A.     MR. JOHNSON

8.     Mr. Johnson is a highly successful leader and sales professional who has spent the bulk of his 25-year career in the healthcare technology field. During his career, he has held positions of major responsibility with several public and private companies in this sphere.

9.     During the three years he was chief executive officer of Visuwell, Mr. Johnson led the company away from the brink of extinction and helped increase its sales by 1,200%.

10.     VisuWell's commercial success was due, in large part, to the proprietary software program Mr. Johnson previously developed and brought to VisuWell. Mr. Johnson developed the proprietary software program through his own risk capital and hard work. The proprietary software program was and is still being used by VisuWell to provide telehealth services to UH Cleveland under the parties' telehealth vendor contract.

11.     Prior to UH Cleveland's conduct, Mr. Johnson had a lucrative employment contract with VisuWell. A true and correct copy of Mr. Johnson's employment contract with VisuWell, with irrelevant portions redacted, is attached hereto as *Exhibit A*.

12.     VisuWell has its offices and principal place of business in Tennessee. VisuWell provides services to UH Cleveland from its offices in Tennessee.

**B.      UH CLEVELAND**

13.      UH Cleveland is one of Ohio's largest networks of primary care physicians, outpatient centers, and hospitals.

14.      UH Cleveland provides a variety of gender diversity services to patients. A true and correct copy of UH Cleveland's gender diversity web page, which is hereby incorporated by reference, is available at: https://www.uhhospitals.org/about-uh/diversity-and-inclusion/lgbtqia-services (last visited August 18, 2021). UH Cleveland states, on its website, that "[o]ur goal is to be nationally recognized as a trusted leader in providing for the physical, mental, social and emotional well-being of LGBTQIA+ patients."

15.      UH Cleveland and its representatives and agents had actual and constructive knowledge of Mr. Johnson's employment contract and his employment relationship with VisuWell.

16.      In March 2021, UH Cleveland announced that it selected VisuWell to be its principal telehealth software vendor.

17.      UH Cleveland signed a vendor services contract with VisuWell on or about March 11, 2021.

18.      The vendor services contract with UH Cleveland was VisuWell's largest business deal at the time it was signed. The vendor services contract made UH Cleveland the largest client of VisuWell.

19.      UH Cleveland operates an official Twitter account that it used to publish several tweets relevant to this action. UH Cleveland uses the Twitter username @UHhospitals, and its official Twitter account can be accessed at https://twitter.com/UHhospitals (last visited Aug. 23, 2021).

## C.    JURISDICTION AND VENUE

20.    Mr. Johnson restates and incorporates by reference the preceding paragraphs as if fully restated herein.

21.    Mr. Johnson is a citizen of the State of Tennessee. Mr. Johnson resides and is domiciled in Williamson County, Tennessee, which is in the Nashville Division of the Middle District.

22.    UH Cleveland is a citizen of the State of Ohio. UH Cleveland is a nonprofit corporation formed under the laws of the State of Ohio. UH Cleveland has its principal place of business at 3605 Warrensville Center Road, Shaker Heights, Ohio 44122. Therefore, UH Cleveland is a corporation and citizen of Ohio pursuant to 28 U.S.C. § 1332(c)(1).

23.    There exists complete diversity of citizenship between Mr. Johnson and UH Cleveland.

24.    The amount in controversy greatly exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests, costs, and attorneys' fees.

25.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

26.    This Court has personal jurisdiction over UH Cleveland pursuant to Tenn. Code 20-2-223(a)(1), (2), and (4), and the due process requirements of the United States Constitution.

27.    Pursuant to Tenn. Code 20-2-223(a)(1), UH Cleveland transacts business with VisuWell in Tennessee. UH Cleveland has a lucrative vendor services contract with VisuWell in this state. The vendor services contract allows VisuWell to provide telehealth technology services and software to UH Cleveland from its offices in Tennessee. This action arises from and relates to the vendor services contract and UH Cleveland's wrongful leveraging of the contract to have Mr. Johnson terminated.

Case 3:21-cv-00656   Document 1   Filed 08/24/21   Page 5 of 24 PageID #: 5

28.     Pursuant to Tenn. Code 20-2-223(a)(2), UH Cleveland contracts to supply "things" in Tennessee because UH Cleveland's vendor services contract with VisuWell contemplates that UH Cleveland will submit payment to VisuWell in Tennessee via invoices issued by VisuWell from Tennessee. *See United Agric. Servs., Inc. v. Scherer*, 17 S.W.3d 252, 1999 Tenn. App. LEXIS 613 (Tenn. Ct. App. 1999).

29.     Pursuant to Tenn. Code 20-2-223(a)(4), UH Cleveland caused tortious injury to be suffered by Mr. Johnson in Tennessee via acts occurring outside Tennessee. UH Cleveland, through the acts described herein, induced a citizen of Tennessee, VisuWell, to breach its contract with Mr. Johnson, another citizen of Tennessee.

30.     UH Cleveland regularly solicits business and services from VisuWell in Tennessee by updating its software systems with computer code created by VisuWell in Tennessee, by consulting with VisuWell on the operation and management of the VisuWell computer code, and by cultivating an ongoing business relationship with VisuWell. UH Cleveland derives substantial revenue from services rendered and software maintained and created by VisuWell in Tennessee.

31.     Exercising jurisdiction over UH Cleveland would not offend traditional notions of fair play and substantial justice because UH Cleveland could have, and indeed should have, reasonably foreseen being haled into a Tennessee court after it targeted Mr. Johnson in Tennessee over conduct he purportedly committed in Tennessee, and demanded to VisuWell, a citizen of Tennessee, that Mr. Johnson be discharged as its chief executive officer.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because UH Cleveland is subject to personal jurisdiction in this District, and/or a substantial part of the events giving rise to this claim occurred in this District, including but not limited to the April 24 Incident and the termination of Mr. Johnson's employment.

**D.    THE APRIL 24 INCIDENT.**

33.    On Saturday, April 24, 2021, Mr. Johnson's day was like any other. He spent most of it catching up on errands and to-do's that had accumulated over the past week. In the afternoon, he took his dog for a walk, then went to his office to work.

34.    In the evening, Mr. Johnson had plans to meet his son and his son's girlfriend for an early dinner at the Harpeth Hotel's 1799 Restaurant in Franklin, Tennessee. Mr. Johnson's wife was out of town.

35.    A little after 5:00 p.m., Mr. Johnson walked from his office to the Harpeth Hotel a short distance away. He was the first of his group to arrive.

36.    While he was waiting for his son and his son's girlfriend, Mr. Johnson sat in the common area and initiated a conversation with a gentleman from California who was on a house-shopping trip in Tennessee.

37.    During that conversation, the two men were interrupted several times by loud yelling, cursing, and invasive noise in the lobby and restaurant area.

38.    The vulgarities were emanating from a group of approximately 10 to 15 teenagers dressed for prom, entering the hotel lobby and area where the two men were seated.

39.    Mr. Johnson did not know any of the teenagers. The teenagers were complete strangers to Mr. Johnson.

40.    The noise and vulgarities continued for approximately 45 to 50 minutes as the group of teenagers moved freely around the hotel, taking photos with different backdrops in the facility.

41.    The vulgarities were the worst Mr. Johnson had ever heard in a public place. The customers in the hotel were even making concerned eye contact with one another, shaking their

heads, and were clearly disappointed that neither the staff nor the adult chaperones were keeping the promgoers under better control.

42.     At one point, a mother of a young child walked by Mr. Johnson, scooped up the child and whispered toward Mr. Johnson, "I can't believe this is happening right now," and left the building.

43.     Because of all the commotion, Mr. Johnson offered to pay the visitor's check. The visitor allowed Mr. Johnson to pay his check and left the hotel restaurant.

44.     About that same time, Mr. Johnson's son and his son's girlfriend arrived. Both immediately noticed the noisy prom group and asked what was going on. Mr. Johnson told them about the prolonged noise and vulgarities. Mr. Johnson expressed his hope that the group would soon leave for the prom.

45.     The prom was not being held at the Harpeth Hotel.

46.     The promgoers were not patrons of the Harpeth Hotel.

47.     Despite the fact that non-patrons of the hotel were causing an enormous disturbance, the hotel took no action to address the problems confronted by Mr. Johnson and its other paying guests.

48.     Mr. Johnson and his group ordered food. Mr. Johnson then excused himself to go use the restroom.

49.     To get to the restroom, Mr. Johnson had to walk through the courtyard where the group of teenagers were standing. He again encountered loud, vulgar, and obnoxious language and behavior coming from the prom group. Mr. Johnson ignored it and continued to the restroom.

50.     Mr. Johnson left the restroom and made his way back to his table. When he crossed through the courtyard, he passed by an adult who was apparently supervising the prom group.

Case 3:21-cv-00656   Document 1   Filed 08/24/21   Page 8 of 24 PageID #: 8

51.     Mr. Johnson briefly asked the adult, "Do you think it would be possible to ask your group to tone it down a bit?" The adult responded, "They're just kids having fun," and she waved Mr. Johnson off with her hand.

52.     Dalton Stevens, one of the teenagers in the group, overheard Mr. Johnson's brief conversation with the adult. Stevens was wearing a red prom dress and was there with his boyfriend, Jacob Geittmann.

53.     Stevens and Geittmann instigated a confrontation with Mr. Johnson by verbally attacking, berating, and heckling Mr. Johnson. At the same time, Geittmann started recording Mr. Johnson on his cell phone.

54.     Instead of engaging in argument with the teenagers, Mr. Johnson started walking away, trying to get back towards his table at the restaurant.

55.     The teenagers, including Stevens and Geittmann, continued to verbally attack and berate Mr. Johnson, moving themselves toward the door that Mr. Johnson needed to use to return to his table.

56.     As Mr. Johnson was trying to get back to his dinner table, the prom group continued to address him, and Mr. Johnson turned towards the chaperones to respectfully hear them out, before returning to his table.

57.     Geittmann was videotaping the brief encounter between Mr. Johnson and Stevens while at the same time participating in the verbal harassment, seeking agreement to random statements designed by Geittmann to sound "homophobic." This videotape is what became the Video Clip.

58.     At one point, Geittmann, while he was filming, got so close to Mr. Johnson that Geittmann made contact with Mr. Johnson's right shoulder. Mr. Johnson reflexively moved his shoulder and arm to avoid further contact with Geittmann.

59.     Mr. Johnson was eventually able to return to his table.

60.     Mr. Johnson and his group, seeing no end to the histrionics, left the Harpeth Hotel to find a quiet location to have dinner.

61.     During the entirety of the April 24 Incident, Mr. Johnson never expressed any anger, raised his voice, or threatened the prom group in any way, even though the promgoers emotions were visible and extreme.

E.      **THE VIDEO CLIP AND ITS FALSE NARRATIVE REACH PROMINENCE ON THE INTERNET.**

62.     Geittmann published the Video Clip to his personal TikTok account on or about April 24, 2021. Within hours of his initial post, the video quickly spread across other internet sites such as Twitter, Reddit, and LinkedIn.

63.     Shortly after Geittmann published the Clip to TikTok, TikTok removed the Clip from its service and did not allow Geittmann to republish it. However, before TikTok removed the Clip, it was downloaded and mirrored to many other devices and social media services, including Twitter, Reddit, and LinkedIn.

64.     On or about April 25, 2021, Geittmann published another two videos to his TikTok account. These videos will be referred to herein as "Geittmann's Part One" and "Geittmann's Part Two." In Geittmann's Part One, he admits that TikTok removed the Clip from its service and did not allow him to republish it. In addition, Geittmann manufactures several false factual statements about Mr. Johnson's purported conduct at the April 24 Incident. Geittmann states, in part:

This [is] a long story; probably gonna [sic] have to make multiple parts, but I'm in college, my boyfriend's a senior in high school, and he decided that he wanted to wear a dress for his senior prom to kinda [sic] break the stigma around men wearing dresses. He looked gorgeous, everybody loved it, nobody had a problem with it, right?

We went to this hotel close to where we lived, and we got a lot of good photos, we were there for about an hour and right as we were about to leave we were standing outside in this little middle area with a bunch of buildings surrounding us. This man comes up, stands about an inch behind my boyfriend and he's like "what are you wearing?" And he's like, "a dress, why?" And he's like, "well why are you wearing that you shouldn't be wearing that." And he's like, "I can and I want to and I really don't give a fuck what you think."

So this man starts going on and on, throwing insults at [Stevens], "you look disgusting," "you look like an idiot," "men shouldn't be wearing this," all of this homophobic banter.

So I grab my phone to start to record because I knew I wanted to record this shit from the get go, so I grab my phone, start to record, he slaps my phone out of my hand and goes flying over on the concrete.

In Geittmann's Part Two, he continues spouting a false factual narrative of the April 24 Incident:

So he hits my phone out of my hand, it goes flying on the concrete. I go to grab it to start recording him again, and he tries to swing at me again which you can see in the original video, the camera goes out for a second, you can see him swinging. He tries to hit my phone out of my hand again but he misses and he hits my boyfriend in the back.

So that's when all of the moms that were there, they're getting really involved now, they're like, "you need to calm down, like this is absolutely ridiculous, you are out of your mind."

At this point the hotel staff had gotten word from inside about what was going on. So two other ladies come out and they're like, "okay guys, what's going on out here." He pretends like he has absolutely no clue what's going on. He's standing there, he's like "I've just been standing here the whole time, I don't know what's going on, I didn't try to talk to them, I didn't hit him, I didn't try to smack his phone out of his hand." I'm like, "dude, I have a minute long video of you harassing us, you can't just blatantly deny it like that."

The staff was really great about everything, they sent him back to the bar because he was pretty obviously drunk, just cause they were calling the police and they didn't want him to freak out more than he already was.

And as we were leaving they told us they were kicking him out and calling the police, so, I guess it's a win.

65.    Geittmann's false factual narrative is almost entirely belied by the Video Clip. Specifically, Geittmann's repeated contentions about Johnson's supposed belligerence and instigation and drunkenness are false, and Geittmann's own video clip shows these claims to be false.

66.    The Video Clip continued to garner attention between April 24 and April 25, 2021.

67.    The Video Clip, however, did not reach mainstream prominence until April 26, 2021, when "online famous" and malign internet provocateur Kathy Griffin republished the Clip to her personal Twitter account, commenting: "[i]f this is Mr. Johnson Johnson in Nashville, Tennessee, the CEO of @VisuWell, healthcare-tech-growth strategist, married to Jill Johnson where they may reside in Franklin Tennessee, it seems like he's dying to be online famous." This tweet remains online and can be viewed by the Court at: https://twitter.com/kathygriffin/status/1386556994560020481?s=20 (last visited August 18, 2021). A true and correct copy of this tweet is attached as *Exhibit B* and is reprinted below for convenience.



68. Kathy Griffin has over two million followers on Twitter. Griffin's followers quickly spread her tweet across the internet and provided their own commentary. Some of them wrote, "why is he creeping on kids in their prom dresses,"[2] and "woah… [sic] how does [Mr. Johnson] disturb kids going to prom? Glad the kid was able to stand proud but they shouldn't have to encounter bullies on prom day or ever! @glaad."[3]

69. It was after and likely in response to Kathy Griffin's tweet that UH Cleveland ultimately took notice of the Video Clip. After it learned of the Clip, UH Cleveland made a unilateral and intentional decision, motivated by commercial and financial incentives, to induce VisuWell to fire Mr. Johnson for his purported conduct at the April 24 Incident. And so it began.

---

[2] https://twitter.com/Seattle_Fan1980/status/1386563400747028483 (last visited August 18, 2021).
[3] https://twitter.com/LaurenKJoyce/status/1386564275729092609 (last visited August 18, 2021).

**F.     UH CLEVELAND EMBARKS ON A VENGEFUL CAMPAIGN TO HAVE MR. JOHNSON TERMINATED.**

70.     On or about April 26, 2021, several hours after Kathy Griffin's tweet was published, UH Cleveland published the following public statement via three tweets from its corporate Twitter account:

> University Hospitals is shocked and disturbed by the recent video of VisuWell's Chief Executive Officer, which is inconsistent with our values of diversity, equity and inclusion. UH has long supported the medical, emotional and social needs of LGBTQIA+ patients, and those (1/3)[4]
>
> ***
>
> who are questioning and/or exploring their identity. UH's LGBTQIA+ provider care team offers innovative gender and sexual diversity services in Northeast Ohio. In light of this recent event, we are evaluating our business relationship with VisuWell, but regardless will (2/3)[5]
>
> ***
>
> continue to meet the needs of our patients in Northeast Ohio. (3/3)[6]

The above will be referred to as "UH Cleveland's First Tweet" or the "First Tweet." A true and correct copy of UH Cleveland's First Tweet is attached hereto as ***Exhibit C***.

71.     Despite UH Cleveland's statement that it was merely "evaluating" its business relationship with VisuWell, UH Cleveland did far more than "evaluate."

72.     On the same day UH Cleveland published its tweet, representatives of UH Cleveland, knowing Mr. Johnson had an employment and other contractual agreements with VisuWell, called the Chairman of the Board of VisuWell and verbally demanded that Mr. Johnson be fired. It is reasonable to impute UH Cleveland's knowledge of the contract between VisuWell

---

[4] https://twitter.com/UHhospitals/status/1386780499339841542?s=20 (last visited August 18, 2021).
[5] https://twitter.com/UHhospitals/status/1386780501265068039?s=20 (last visited August 18, 2021).
[6] https://twitter.com/UHhospitals/status/1386780503525703681?s=20 (last visited August 18, 2021).

Case 3:21-cv-00656   Document 1   Filed 08/24/21   Page 14 of 24 PageID #: 14

and Johnson because UH Cleveland knew Johnson was the CEO of the company. UH Cleveland is sophisticated enough to know that nearly every CEO in the United States has some form of employment agreement.

73.     The same UH Cleveland representatives gave the Chairman an ultimatum: if UH Cleveland's demands were not met immediately, then UH Cleveland would pull its business from VisuWell. This act forced VisuWell to terminate Johnson's employment agreement and its employment relationship with Mr. Johnson.

74.     UH Cleveland was the proximate cause of Mr. Johnson's injury. On or about April 25, 2021, the day before UH Cleveland representatives called VisuWell to deliver its ultimatum, VisuWell's Chairman of the Board of Directors called Mr. Johnson to ask him about the Video Clip. During this conversation, Mr. Johnson asked the Chairman whether VisuWell had any plans to take action against him. The Chairman told Mr. Johnson that VisuWell had no plans to terminate Mr. Johnson and would stand by him despite the inflated outrage over the Video Clip. The next day, UH Cleveland delivered its ultimatum. But for UH Cleveland's interference, Mr. Johnson would not have been fired. UH Cleveland's actions played an active and substantial part in the breach of the employment contract between Mr. Johnson and VisuWell.

75.     UH Cleveland's conduct was malicious. It used the notoriety of the Video Clip, and its ability to ruin Johnson's career, as a marketing opportunity. UH Cleveland intended to leverage the notoriety of the Clip for its sole commercial benefit. Such an intent is demonstrated by two key facts. First, UH Cleveland gained marketing recognition for its sexual diversity services by attacking Mr. Johnson, the purported "homophobic bully." UH Cleveland's tweet is an opportunistic advertisement for its gender diversity services: "UH has long supported the medical, emotional and social needs of LGBTQIA+ patients, and those who are questioning and/or

exploring their identity. UH's LGBTQIA+ provider care team offers innovative gender and sexual diversity services in Northeast Ohio." This opportunistic use of Johnson's misfortune at being wrongfully attacked is crass, callous, and malicious.

76.     Second, UH Cleveland's attacks on Mr. Johnson raised its profile as a social justice champion. It is well recognized that social responsibility campaigns boost a company's brand image and positively influence profits and the value of the company's trademarks.[7] Corporate social responsibility campaigns build brand equity by building brand awareness, enhancing brand image, establishing brand credibility, evoking brand feelings, creating a sense of brand community, and eliciting brand engagement.[8] In this way, UH Cleveland's campaign to induce VisuWell to fire Mr. Johnson were published, in part, for the purpose of enhancing UH Cleveland's tangible and intangible monetary value. UH Cleveland's insertion of its marketing slogans and branding statements in the midst of its public responses to the Video Clip shows UH Cleveland's desire to use this April 24 Incident to enhance its profitability.

77.     Because of the silver-platter marketing opportunity presented by the Video Clip and a captive audience and potential customer base, UH Cleveland stood to benefit personally from Mr. Johnson's discharge.

78.     UH Cleveland's conduct was intended to advance its sole commercial and financial interests at Mr. Johnson's expense.

79.     UH Cleveland's conduct was purely malevolent. UH Cleveland desired to do harm to Mr. Johnson for its own sake.

---

[7] Timothy Creel, *How Corporate Social Responsibility Influences Brand Equity*, Management Accounting Quarterly, Summer 2012, Vol. 13, No. 4, *available at* https://www.imanet.org/-/media/5ab6966eedf6461ab37ff8b8f2fb6eba.ash (last visited March 9, 2021).
[8] *Id.*

80.     UH Cleveland leveraged the inflated and unsubstantiated outrage over the Video Clip for its own commercial benefit.

81.     UH Cleveland acted in willful violation of a known right belonging to Mr. Johnson.

82.     UH Cleveland's conduct was malicious because without justification, it willfully coerced VisuWell to terminate Johnson's contract.

83.     UH Cleveland knew that VisuWell would have no choice but to accede to its demand and surrender to its ultimatum that Mr. Johnson be fired, given that UH Cleveland was VisuWell's largest customer.

84.     UH Cleveland improperly and maliciously leveraged its power as VisuWell's largest customer to have Mr. Johnson fired from his job. UH Cleveland knew that its campaign to oust Mr. Johnson would result in Mr. Johnson losing millions of dollars in future income and other economic and contractual benefits arising from his employment with VisuWell; as well, UH Cleveland understood that its effort to have VisuWell fire Mr. Johnson and then publicly take credit would perpetually harm Mr. Johnson's reputation and render him unemployable.

85.     UH Cleveland knew and acted with reckless disregard of the fact that, in order to promote its gender diversity services to a captive audience and customer base, UH Cleveland had to attack and denigrate Mr. Johnson's reputation and professional status. UH Cleveland is a sophisticated business capable of identifying and understanding the inherent bias of an edited, out-of-context video.

86.     UH Cleveland, upon information and belief, baselessly adopted the position that Mr. Johnson was a "homophobic bully" and therefore intended to attack him, ruin his reputation, and have him fired from his job at VisuWell.

87.     UH Cleveland, through its conduct, exhibited clear hatred, ill will, and a spirit of revenge towards Mr. Johnson.

88.     UH Cleveland, in addition, acted with reckless disregard of the truth of the April 24 Incident. UH Cleveland should have known, and likely did know, that the Video Clip showed only a mere snippet of a larger incident. UH Cleveland should have known, and likely did know, that almost the entirety of Geittmann's false narrative on April 25, 2021 was clearly belied by the Video Clip.

89.     UH Cleveland's conduct was not legally privileged or justified. UH Cleveland took the extraordinary step of initiating a private phone call to VisuWell's Chairman of the Board of Directors, demanding that VisuWell fire Mr. Johnson. That was a private act behind closed doors.

90.     UH Cleveland exerted undue, unreasonable, and unjustifiable economic pressure upon VisuWell by propounding upon it an ultimatum, unrelated to the subject matter of its vendor services agreement, that VisuWell could not refuse. The ultimatum delivered by UH Cleveland was not legally privileged or justified.

## G.     VISUWELL FIRES MR. JOHNSON AS A PROXIMATE RESULT OF UH CLEVELAND'S CONDUCT.

91.     On the morning of April 27, 2021, VisuWell published a public statement on its Twitter page, "condemning" Mr. Johnson's purported actions during the April 24 Incident and announcing that it had fired Mr. Johnson. The tweet remains online and is available at https://twitter.com/VisuWell/status/1386974326298189825?s=20 (last visited August 18, 2021). Specifically, VisuWell's public statement said:

> We unequivocally condemn the behavior exhibited by Mr. Johnson in a recent video widely circulated on social media. After investigating the matter and speaking to individuals involved, the VisuWell Board of Directors has chosen to terminate Mr. Johnson from his position as CEO, effective immediately. Gerry Andrady,

our President and COO, will lead the company through this important time.

VisuWell's culture emphasizes respect, kindness, and compassion, especially for those from traditionally marginalized communities, and we maintain a zero-tolerance policy for intolerance of any kind. Mr. Johnson's actions contradicted the high standards we set for ourselves in promoting the health of those who use our platform.

We share the concerns that so many have expressed on this matter and look forward to announcing concrete steps we are taking in support of the LGBTQ community in particular over the coming weeks.

A true and correct copy of the public statement is attached hereto as ***Exhibit D***.

92.    VisuWell terminated Mr. Johnson's employment contract on or about April 26, 2021. Such termination constituted, under the terms of the employment contract, a breach thereof.

93.    VisuWell ceased all employment relations with Mr. Johnson on or about April 26, 2021.

94.    UH Cleveland wasted no time in informing the public about its victory. UH Cleveland, on the same day VisuWell published its public statement, took its own "victory lap" when it published, via three tweets, the following statements:

University Hospitals does not tolerate discrimination or harassment in any form by our caregivers or by the vendors who work with us. We acted immediately to express our concerns to the Chair of the VisuWell Board. Within hours, VisuWell advised us that they had terminated (1/2) [sic][9]

\*\*\*

Mr. Johnson from his position as CEO and pledged to take concrete steps in support of the LGBTQIA+ community in particular over the coming weeks. UH was prepared to terminate our agreement with VisuWell had their leadership not stepped up to do the right thing. We will (2/3)[10]

\*\*\*

---

[9] https://twitter.com/UHhospitals/status/1387173486880346113?s=20 s(last visited August 18, 2021).
[10] https://twitter.com/UHhospitals/status/1387173488809623564?s=20 (last visited August 18, 2021).

continue to monitor their follow through on their commitments to
further a culture of diversity and inclusion that we expect in all of
our business relationships. (3/3)[11]

The above will be referred to as "UH Cleveland's Second Tweet" or the "Second Tweet."

Collectively, UH Cleveland's tweets are referred to herein as the "UH Cleveland's Tweets." A

true and correct copy of UH Cleveland' Second Tweet is attached hereto as **Exhibit E.** This

"victory lap" is further evidence that UH Cleveland acted maliciously, with an ulterior motive and

purpose that required it destroy Mr. Johnson's reputation and professional status.

95.    Mr. Johnson's actions did not breach any term or provision of UH Cleveland's
vendor services contract with VisuWell.

96.    Even Geittmann later admitted, in another video he published on his TikTok

account on July 19, 2021, that an investigation into the April 24, 2021 should have occurred prior

to Mr. Johnson being fired. Geittmann stated, in part:

> … me and Dalton both agreed that VisuWell, the company that he
> was the CEO of, should have done a more, you know, thorough and
> formal investigation and then made a decision whether or not to fire
> [Mr. Johnson] based on the evidence that we presented.

97.    In total, UH Cleveland's conduct has inflicted severe emotional distress upon Mr.

Johnson, including: embarrassment, psychic injury and psychological pain and suffering, loss of

the respect and affection of his friends and business colleagues, losing the respect and affection of

those with whom he serves on boards and commissions, and losing the good reputation he

developed over his many years of community leadership.

---

[11] https://twitter.com/UHhospitals/status/1387173491565334529?s=20 (last visited August 18, 2021).

## CAUSES OF ACTION

### Count 1—Tortious Interference with Employment Relations

98.     Mr. Johnson restates and incorporates by reference the above paragraphs as if fully realleged herein.

99.     An employment relationship existed between Mr. Johnson and VisuWell.

100.    UH Cleveland knew and was otherwise aware of the employment relationship between Mr. Johnson and VisuWell. During business negotiations relating to the vendor services agreement between UH Cleveland and VisuWell, negotiations to which Mr. Johnson was directly involved and almost always a party, UH Cleveland learned that Mr. Johnson was chief executive officer of VisuWell.

101.    UH Cleveland was an "outsider" to Mr. Johnson and VisuWell's employment relationship. UH Cleveland stood as a third-party to Mr. Johnson's employment relationship with VisuWell.

102.    UH Cleveland and VisuWell do not and did not have unified or closely tied interests with respect to Mr. Johnson's continued employment, e.g., there was no unity of ownership, no unity of control over Mr. Johnson, no unity of board members, or similar business control or ownership arrangements.

103.    Nothing in UH Cleveland and VisuWell's vendor services contract permits UH Cleveland to demand that certain VisuWell personnel be fired.

104.    Nothing in UH Cleveland and VisuWell's vendor services contract permits UH Cleveland to make management and employment decisions on behalf of VisuWell.

105.    UH Cleveland intentionally interfered with Mr. Johnson's employment relationship with VisuWell, as previously alleged herein.

106.    UH Cleveland maliciously, spitefully, and with malevolent intent interfered with Mr. Johnson's employment relationship with VisuWell.

107.    UH Cleveland's conduct exhibited hatred, ill will, and a spirit of revenge over Mr. Johnson's purported conduct at the April 24 Incident.

108.    UH Cleveland, as well, exhibited conduct amounting to extremely reckless behavior that revealed a conscious disregard for a great and obvious harm.

109.    UH Cleveland failed to investigate the April 24 Incident in any manner whatsoever. In fact, UH Cleveland should have known, and likely did know, that there was more to the story than the short Video Clip showed.

110.    UH Cleveland's interference proximately caused Mr. Johnson to suffer significant injury and other damages.

## Count 2—Common Law Tortious Interference with Contractual Relations

111.    Mr. Johnson restates and incorporates by reference the above paragraphs as if fully realleged herein.

112.    Mr. Johnson, as previously alleged, had a valid and enforceable employment contract with VisuWell. A true and correct copy of that employment contract, with irrelevant portions redacted, is attached hereto as *Exhibit A*.

113.    UH Cleveland knew about and was otherwise aware of Mr. Johnson's employment contract with VisuWell, as previously alleged herein.

114.    UH Cleveland, as alleged above, intentionally procured the contract's breach and intended to induce a breach of Mr. Johnson's employment contract with VisuWell.

115.    VisuWell terminated Mr. Johnson's employment contract as a result of UH Cleveland's demands.

116.    VisuWell's termination of Mr. Johnson on or about April 27, 2021 constituted a breach of the employment contract between VisuWell and Mr. Johnson.

117.    UH Cleveland's interference was improper and lacked any justification whatsoever.

118.    As a proximate result of UH Cleveland's conduct, Mr. Johnson suffered severe damages.

### Count 3–Statutory Tortious Interference with Contractual Relations
### Pursuant to Tenn. Code 47-50-109

119.    Mr. Johnson restates and incorporates by reference the above paragraphs as if fully realleged herein.

120.    Mr. Johnson, as previously alleged, had a valid and enforceable employment contract with VisuWell. A true and correct copy of that employment contract, with irrelevant portions redacted, is attached hereto as ***Exhibit A***.

121.    UH Cleveland knew about and was otherwise aware of Mr. Johnson's employment contract with VisuWell, as previously alleged herein.

122.    UH Cleveland, as alleged above, intentionally procured the contract's breach and intended to induce a breach of Mr. Johnson's employment contract with VisuWell all in violation of Tenn. Code 47-50-109.

123.    VisuWell terminated Mr. Johnson's employment contract as a result of UH Cleveland's demands.

124.    VisuWell's termination of Mr. Johnson on or about April 27, 2021, constituted a breach of the employment contract between VisuWell and Mr. Johnson.

125.    UH Cleveland's interference was improper and lacked any justification whatsoever.

126.    As a proximate result of UH Cleveland's conduct, Mr. Johnson suffered severe damages.

**WHEREFORE**, Plaintiff Samuel Johnson respectfully prays:

(a) That judgment be entered against UH Cleveland for substantial compensatory damages in an amount to be determined at trial;

(b) That UH Cleveland be held liable for the emotional distress Mr. Johnson has and will suffer along with the perpetual reputational harm it has caused Mr. Johnson;

(c) That judgment be entered against UH Cleveland for punitive and treble damages in an amount to be determined at trial;

(d) That Mr. Johnson recover all statutory damages permitted by Tenn. Code 47-50-109.

(e) That Mr. Johnson recover pre- and post-judgment interest;

(f) That Mr. Johnson recover his reasonable attorneys' fees and expenses from UH Cleveland;

(g) For trial by jury on all issues so triable;

(h) That all costs of this action be taxed to UH Cleveland; and

(i) That the Court grant all such other and further relief that the Court deems just and proper, including equitable relief.

Respectfully submitted,

**HEMMER DEFRANK WESSELS, PLLC**

*/s/ Todd V. McMurtry*
Todd V. McMurtry
(*pro hac vice* forthcoming)
J. Will Huber
(*pro hac vice* forthcoming)
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
whuber@hemmerlaw.com

**BURROW & CRAVENS**

*/s/ Timothy W. Burrow*
Timothy W. Burrow (Bar No. 017280)
112 30th Avenue North
Nashville, Tennessee 37203
Phone: (615) 252-2502
Fax: (615) 252-2508
tburrow@burrowcravenslaw.com

*Trial Attorneys for Plaintiff,*
*Mr. Samuel Johnson.*