# EXECUTIVE EMPLOYMENT AGREEMENT

This **EXECUTIVE EMPLOYMENT AGREEMENT** (this "**Agreement**") is made as of  August 28 , 2017, between **WECOUNSEL SOLUTIONS, LLC**, a Tennessee limited liability company (the "**Company**"), and **SAM JOHNSON**, an individual with a residence located at  2441 Durham Manor Dr, Franklin, TN 37064  (the "**Executive**").  In consideration of the promises and the terms and conditions set forth in this Agreement, the parties hereby agree as follows:

## ARTICLE 1
## POSITION AND RESPONSIBILITIES

**SECTION 1.1.  Position.**  Executive shall serve as the Company's Chief Executive Officer ("**CEO**").

**SECTION 1.2.  Responsibilities and Authority.**  Executive shall have such duties and authority as are customarily associated with and incidental to such position as CEO, including without limitation those duties set forth in any effective Operating Agreement of the Company (as amended and in effect, the "**Operating Agreement**"), and as the Company may, from time to time, modify or assign, except as otherwise limited by the Operating Agreement.  Notwithstanding the foregoing, the Executive shall not have the authority to perform any of the activities which requires the consent of the Board of Managers, the Members (as defined in the Operating Agreement) or the holders of Preferred Units (as defined in the Operating Agreement) without such requisite consent.  Executive shall comply with and be bound by any such modifications of responsibilities or limitations of authority as set by the Company, and any of the Company's operating policies, procedures, and practices from time to time in effect, and made known to the Executive during the term of Executive's employment.  Executive shall perform his duties under this Agreement at a location to be agreed by the parties.  Executive hereby represents and warrants that he is free to enter into and fully perform this Agreement and the agreements referred to herein without breach of any agreement or contract to which he is a party or by which he is bound, and hereby acknowledges the terms and conditions of the Operating Agreement.

**SECTION 1.3.  Expected Time Commitment.**  Executive shall devote substantially full time and energy to the business of the Company in order to satisfactorily fulfill his duties associated with this Agreement and apply all of his skill and experience in the performance of his duties to advance the Company's interests, and shall not engage in or accept any employment from any business which is competitive with that of the Company.  Executive shall do nothing inconsistent with the performance of his duties hereunder, or which constitutes a breach of any terms of this Agreement, including without limitation the Restrictive Covenants (as defined by Section 5.3).  Nothing in this Agreement shall preclude the Executive from devoting a reasonable period of time to other activities, provided such activities do not interfere with the performance by the Executive of his duties hereunder.  During the term of his employment, the Executive shall not be engaged in any other business activity which, in the reasonable judgment of the Company, conflicts with the duties of the Executive hereunder and may result in a materially adverse effect on the Company and its goodwill, whether or not such activity is pursued for gain, profit or other pecuniary advantage.

# ARTICLE 2
# TERM OF EMPLOYMENT

The term of the Executive's employment shall commence on the date hereof and shall terminate as set forth in Article 4.

# ARTICLE 3
# COMPENSATION

**3.1. Salary; Bonus.** As used herein, an "**Incentive Compensation Period**" means each consecutive twelve (12) month period commencing on January 1 of each calendar year and expiring on December 31 of the immediately next calendar year, provided, however, that each Incentive Compensation Period is subject to earlier termination as set forth in Article 4.

**3.1.1.** *Base Compensation*. The Company shall pay to the Executive a base annual salary (the "**Base Salary**") of ▮ (payable in bi-weekly installments according to the Company's regular payroll practices and procedures) pro-rated on a daily basis for partial years employed.

**3.1.2.** *Incentive Compensation*.

**(a)** In addition to the Base Salary, the Company shall pay to the Executive, for each of the 2017, 2018 and 2019 Incentive Compensation Periods, incentive compensation (the "**Incentive Compensation**"), which shall be subject to pro ration for partial years of employment pursuant to Section 3.1.2(g) below, equal to the greater of:

**(i)** ▮% of all new revenues generated during such Incentive Compensation Period. For purposes hereof, "new revenues" shall mean any revenues from any customers who are not customers as of the commencement date of Executive's employment as CEO; or

**(ii)** ▮% of the Company's earnings before taxes, depreciation and amortization ("**EBITDA**") for such Incentive Compensation Period, subject to adjustments set forth below.

**(b)** The Company will negotiate in good faith with Executive a revised bonus Incentive Compensation for years after 2019, or in the event of a major corporate/acquisition event (defined as sale of all, or substantially all, of the assets or outstanding equity of the Company by merger or otherwise) or change in the business.

**(c)** Extra-Ordinary Income or Expense. With respect to the determination of EBITDA for any Incentive Compensation Period in connection with the calculation of Incentive Compensation for such Incentive Compensation Period, any unusual item of extra-ordinary, non-operating profit or loss (such as gain or loss from the sale of securities, early extinguishment of debt, write down of goodwill or other intangible asset) for such Incentive Compensation Period will be either added to EBITDA (in the event of an expense or loss) or subtracted from EBITDA

(in the event of income or gain) in connection with the calculation of Incentive Compensation for such Incentive Compensation Period.

**(d)** <u>Gain or Loss from the Sale of the Company's Business or Substantial Portion of its Assets</u>. To the extent that the Company engages in a sale of all or substantially all of its assets, or liquidation of its business and assets, during any Incentive Compensation Period, the resulting gain or loss of the Company shall result in the same respective adjustment to EBITDA for such Incentive Compensation Period in connection with the calculation of Incentive Compensation for such Incentive Compensation Period.

**(e)** The adjustments made to EBITDA shall solely be made in connection with the determination of Incentive Compensation, and the Company shall not be obligated to otherwise adjust its EBITDA for accounting purposes.

**(f)** The Incentive Compensation for any Incentive Compensation Period shall be payable within ninety-five (95) days after the end of such Incentive Compensation Period.

**(g)** With respect to the Incentive Compensation Period in which Executive's employment commences or terminates, the Incentive Compensation payable to Executive during such Incentive Compensation Period shall be pro ratably reduced based upon the actual number of days during such Incentive Compensation Period that Executive shall have been employed.

**3.2. Benefit Plans.** Executive shall be eligible to participate in the Company's employee benefit plans of general application, including without limitation those plans, if any, covering 401K, pension and profit sharing, keyman life and disability insurance, stock purchases, stock options, and those plans covering life, health, and dental insurance in accordance with the rules established for individual participation in any such plan and applicable law. Executive shall receive such other benefits as the Company provides, including 4 weeks of vacation per annum and holidays and sick leave according to the Company's policies. Nothing herein shall be construed as obligating the Company to provide any benefits to its employees as a whole.

**3.3. Expenses.** Subject to such policies as may from time to time be established by the Company for senior executives of the Company generally, the Company shall pay or reimburse the Executive for all reasonable business expenses actually incurred or paid by the Executive during the term of the Executive's employment in the performance by the Executive of his duties under this Agreement, upon presentation of expense statements or vouchers or such other supporting information as the Company may reasonably require.

**3.4. Annual Review.** On an annual basis, the Company shall review the Executive's Base Salary. On a basis consistent with the Company's prevailing salary review policies, the Company may, in its sole discretion, increase the Executive's Base Salary for the then upcoming year above the agreed-upon increase set forth in Section 3.1.1 for such year, if the Company determines that such adjustment is warranted. Furthermore, the Company will negotiate in good

faith with Executive incentive compensation plan for years after 2019, or in the event of a major corporate/acquisition event or change in the business.

### 3.5. Equity.

**3.5.1.** Executive shall receive options to purchase ▆▆▆ Common Units pursuant to an option agreement executed by the Company and the Executive concurrently with this Agreement (the "**Option Agreement**"). Such option will have an exercise price equal to ▆▆▆ per Common Unit and will vest in ▆ quarterly installments of ▆▆▆ Common Units. For avoidance of doubt, a condition to Executive's receipt of any options as described in this Section 3.5.1 shall be the execution and delivery by the Executive of an Option Agreement respecting such options, and all such options shall be subject to the terms and conditions of the Option Agreement. To the extent that there is any conflict or ambiguity between the terms and conditions of this Agreement, on the one hand, and the applicable Option Agreement, on the other hand, the terms and conditions of the Option Agreement shall govern.

**3.5.2.** During the term of this Agreement, Executive shall have the opportunity to invest in the next round of financing of Preferred Units in the Company along the same terms and conditions as other investors.

# ARTICLE 4
# TERMINATION

**4.1. Termination upon Death.** If the Executive dies during the term of this Agreement, this Agreement shall immediately terminate as of the date of the Executive's death without any further notice or action.

**4.2. Termination upon Disability.** Executive's employment may be terminated by the Company if the Executive becomes Disabled, as defined herein. Company may, by written notice to the Disabled Executive, terminate this Agreement and the Executive's employment hereunder. For purposes of this Agreement, the Executive shall be deemed "**Disabled**" when he shall be subject to any incapacity resulting from sickness or accidental bodily injury, that substantially prevents the Executive from performing the existing essential duties of his position with the Company at the time of the onset of such sickness or the occurrence of such accidental bodily injury, for a minimum continuous period of one hundred twenty (120) days, and such disability meets the requirements of disability as set forth in disability insurance policies as typically issued to executives performing duties as contemplated herein. Executive shall be deemed "Disabled" upon the expiration of such 120-day period.

**4.3. Termination for Cause.** The Company may remove the Executive for Cause and terminate this Agreement and the term of the Executive's employment hereunder on the date specified in written notice to the Executive; provided, however, that Executive shall have the right, within ten (10) days after receipt of any such notice, to dispute the occurrence of any Cause events that are detailed in any such notice through binding arbitration pursuant to Section 16.12 below, and if the arbitrator decides in favor of Executive in any such dispute, Executive's employment hereunder shall be automatically reinstated (pursuant to the terms and conditions of this Agreement) upon the date of such decision, and the Company shall pay to the Executive on such reinstatement date any and all compensation which would have accrued and been payable to Executive from the date of notice of termination from the Company until the reinstatement date. In the event that Executive so disputes a termination for Cause, as provided above, the Executive shall be subject to the terms and conditions of this Agreement relating to a termination for Cause and the Executive's obligations thereafter (including without limitation under Article 5), unless and until the Executive's employment is reinstated as set forth above. If terminated for Cause, the Executive shall have no right to receive any monetary compensation or benefit hereunder with respect to any period after the effective date of termination of employment specified in such notice except as otherwise set forth in Section 5.2(a)(i). Such notice may also terminate the Executive's right to enter the Company's premises. For purposes of this Agreement, the term "**Cause**" means any of the following:

**(a)** the willful engaging (including without limitation failure to act) by the Executive in conduct which is or could reasonably be expected to be materially injurious to the Company, provided that no act or failure to act shall be deemed "willful" if such act or omission is done in good faith by the Executive with a reasonable belief that such act or omission was in the best interests of the Company;

**(b)** the demonstrated voluntary unwillingness of the Executive to perform his duties as directed by the Company within ten (10) days of receiving written notice from the Company reasonably detailing such failed performance, unless such performance is incapable of being cured, in which case no notice and cure period shall be required;

**(c)** the willful commission by the Executive of an act constituting a felony, including without limitation an act of fraud, embezzlement or theft;

**(d)** the material breach of any representation, warranty, agreement or covenant made by the Executive in this Agreement, the Operating Agreement (if a party thereto) or any other written agreement between the Executive and the Company, including without limitation any Restrictive Covenant contained in Article 5 of this Agreement; or

**(e)** the Company, after reasonable investigation, finds that the Executive has intentionally violated material written policies or procedures of the Company, including but not limited to, policies or procedures pertaining to harassment and discrimination.

**4.4. Termination without Cause.** The Company shall have the right to terminate this Agreement and the Executive's employment hereunder at any time without Cause, upon written notice of such termination to Executive.

**4.5. Termination by Executive.** Executive shall have the right to terminate employment with the Company by giving ninety (90) days' prior written notice to the Company, provided that the Company may, in its discretion, accelerate the effective date of termination.

**4.6. Compensation on Termination.**

**(a) Compensation.**

**(i)** *Death*. If the term of the Executive's employment hereunder is terminated pursuant to Section 4.1 as a result of Executive's death, the Company shall pay to the Executive all compensation accrued and unpaid up to the effective date of termination, and thereafter the Company's obligations hereunder shall cease and terminate. In addition to the foregoing, the Company may, in its discretion, secure at its own expense certain insurance policies, including without limitation "key-man" life insurance policies upon the life of the Executive, payable to the Company in the event of the Executive's death. The Executive hereby acknowledges and agrees that no person or entity claiming by or through the Executive shall have any right to the proceeds of such insurance policies. The Executive shall execute any and all documents and take all acts that are reasonably requested by the Company to secure and maintain such insurance policies.

**(ii)** *Disability*. If the term of the Executive's employment hereunder is terminated pursuant to Section 4.2 as a result of Executive becoming Disabled, the Company shall pay to the Executive all compensation accrued and unpaid up to the effective date of termination. Any amounts paid by the Company to the Executive herein may be reduced, in the case of termination pursuant to Section 4.2, by the amount which the Executive is entitled to

receive under the terms of the Company's long-term disability insurance policy for senior executives as and if in effect at the effective date of termination.

**(iii)** *For Cause*. If the term of the Executive's employment hereunder is terminated by the Company for Cause pursuant to Section 4.3, the Company shall pay to the Executive all compensation accrued and unpaid up to the effective date of termination, and thereafter the Company's obligations hereunder shall cease and terminate.

**(iv)** *Without Cause*. If the term of the Executive's employment hereunder is terminated by the Company without Cause pursuant to Section 4.4 (which shall exclude, for purposes of this Section 4.6(a)(iv), the termination of Executive's employment upon the sale of all, or substantially all, of the assets or outstanding equity of the Company by merger or otherwise, if the Executive accepts employment with the applicable acquirer in such sale event after being so offered by such acquirer), the Company shall pay to the Executive all compensation accrued and unpaid up to the effective date of termination plus, if the termination occurs after the first six (6) months of employment: (A) an amount equal to the Base Salary then in effect for three (3) months payable in equal installments according to the Company's regular payroll practices and procedures, provided that the Executive is available for consultation during such period in order to assist with the facilitation of search/implementation/training of a new CEO and to promote stability within the Company and team throughout the transition to the new CEO; and (B) an amount equal to the Base Salary then in effect for three (3) months payable in equal installments according to the Company's regular payroll practices and procedures; provided that the Executive shall not be entitled to any of the compensation described in this clause (B) unless and until the Executive executes and delivers to the Company a release in form and substance acceptable to the Company (the "**Release**"), within twenty-one (21) days after the receipt of such Release from the Company, to be effective upon the expiration of a seven (7) day revocation period commencing on the date that the Executive (or, in the event of his death, his surviving spouse, if any, or his estate) executes the Release; and provided further that the Executive shall not be entitled to any of the compensation described in this clause (B) upon the breach of any of Section 5 by the Executive. After all payments required to be made by the Company under this Section 4.6(a)(iv), the Company's obligations hereunder shall cease and terminate.

**(v)** *Voluntary Termination*. If the term of the Executive's employment hereunder is voluntarily terminated by the Executive pursuant to Section 4.5(a), the Company shall pay to the Executive all compensation accrued and unpaid up to the effective date of termination, and thereafter the Company's obligations hereunder shall cease and terminate.

**(b)** The compensation rights provided for the Executive in this Section 4.6 shall be the Executive's sole and exclusive remedies in the event of a breach of this Agreement by the Company, and the Executive shall not be entitled to any other compensation, damages or relief. Any payments made pursuant to this Section 4.6 shall be reduced by such amounts as are required by law to be withheld or deducted.

**4.7. Rights and Remedies Upon Breach.** Notwithstanding the termination rights set forth above, if the Executive or the Company breaches, or threatens to breach, in any material

respect any of the provisions of this Agreement, the non-breaching party shall have all applicable rights and remedies in law and in equity, in addition to its termination rights hereunder, and the non-breaching party shall not be required to terminate this Agreement in order to enforce such rights or seek such remedies.

## ARTICLE 5
## CERTAIN COVENANTS OF EXECUTIVE

**5.1. Confidentiality.**

**(a) Acknowledgements.** Executive acknowledges that, as of the date hereof, the business of the Company, as it exists on the date hereof, and as may exist from time to time after the date hereof (the "**Company Business**") extends or may extend throughout the world (collectively, the "**Region**"). The Executive further acknowledges that (x) the marketplace in which the Company operates is highly competitive and (y) the Executive's duties hereunder will cause the Executive to have access to and be entrusted with various trade secrets not readily available to the public or competitors, including without limitation business accounts, lists of customers and other business contacts, information concerning the Company's relationships with actual and potential clients and customers and the needs and requirements of such clients and customers, budgets, business and financial plans, employee lists, financial information, artwork, designs, graphics, marketing plans, data and techniques, business strategy and development, know-how and other matters connected with the Company or the Company Business (the "**Confidential Information**"), and other intellectual property, including trademark rights, patent rights and copyrights (some of which may be developed in part by the Executive under this Agreement), which intellectual property rights are owned by the Company and used in the operation of the Company Business (collectively with the Confidential Information, the "**Proprietary Information**"). Notwithstanding the foregoing, the parties agree that the term "Confidential Information" shall not include information which (i) is or becomes generally available to the public, without violation of any obligation of confidentiality by the Executive, (ii) is or becomes available from a third party on a non-confidential basis provided that such third party is not bound by a confidentiality agreement concerning the Confidential Information or (iii) is or has been independently acquired or developed by the Executive without violating the provisions of this Section.

Executive further acknowledges that the Proprietary Information will be disclosed to the Executive or obtained by the Executive and received in confidence and trust for the sole purpose of using the same for the sole benefit of the Company Business. Executive also acknowledges that the Proprietary Information is valuable to the Company, of a unique and special nature, and important to the Company in competing in the marketplace.

During and after the term of this Agreement (other than in the performance of the Executive's duties hereunder), without the Company's prior written consent, the Executive shall not divulge or use any or all of the Proprietary Information to or for any person or entity except (i) for the benefit of the Company and as necessary to perform the Executive's duties under this Agreement and (ii) when required by law and then only after consultation with the Company or unless such information is in the public domain. In the event that the Executive becomes or is

legally compelled (whether by deposition, interrogatories, request for documents, subpoena, civil investigative demand or similar process) to disclose or use any Proprietary Information, the Executive shall provide the Company with prompt, prior written notice of such requirement so that the Company may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Section 5.1.

**(b)** **Breach**. Executive acknowledges, understands and agrees that the Executive's employment with the Company may be terminated if the Executive breaches this Section 5.1 or in any way divulges such Proprietary Information. Executive further acknowledges, understands and agrees that the Company may be irreparably harmed by any violation or threatened violation of this Agreement and, therefore, the Company may be entitled to injunctive relief to enforce its provisions.

**5.2.** **Non-Competition and Non-Solicitation.**

**(a)** **Non-Compete; Non-Solicitation.**

**(i)** **Non-Competition.** Executive shall not directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, member, manager, stockholder, corporate officer or director, or in any other individual or representative capacity, engage or participate in any activity or business which the Company shall determine in good faith to be in direct competition in any substantial way with the Company or the Company Business within the Region during the term of the Executive's employment hereunder, and continuing until the later to occur of (x) the date upon which the Executive is not a Member of the Company or (y) that date which is six (6) months after the termination date of the Executive's employment hereunder.

Notwithstanding the above, in the event that Executive disputes any termination for Cause pursuant to Section 4.3, the Executive shall be subject to the non-competition covenants set forth above during the arbitration period of such dispute.

**(ii)** **Non-Solicitation.** During the term of the Executive's employment hereunder, and continuing until the later to occur of (x) twenty-four (24) months after the termination date of the Executive's employment hereunder, and (y) the date upon which the Executive is not a Member, the Executive shall not (A) directly or indirectly, either alone or in concert with others, solicit or entice or participate in the solicitation or attempt to solicit or in any manner encourage employees of the Company to leave the Company or work for anyone that is in competition in any substantial way with the Company or otherwise provide references regarding such employee to any other employer (unless expressly permitted by the Company); or (B) directly or indirectly call on, solicit, or take away, or attempt to call on, solicit or take away, any of the Company's customers on behalf of any business that is in competition in any substantial way with the Company; provided, however, that the public listing advertising or posting of an available position shall not constitute solicitation or an attempt to solicit hereunder and this Section 5.2(a)(ii) shall not preclude the Executive from hiring an individual pursuant thereto. Notwithstanding the foregoing, the Executive shall retain the right to invest in or have

an interest in entities traded on any public market or offered by any national brokerage house, provided that such interest does not exceed five percent (5%) of the voting control of such entity.

**(b)** **Return of Company Property.** In the event of the termination of the Executive's employment, the Executive shall deliver to the Company all devices, records, sketches, reports, proposals, files, customer lists, mailing and contact lists, correspondence, computer tapes, discs and design and other document and data storage and retrieval materials (and all copies, compilations and summaries thereof), equipment, documents, duplicates, notes, drawings, specifications, research, tape and other electronic recording, programs, data and other materials and property of any nature belonging or relating to the Company or the Company Business, and the Executive shall not take with the Executive or allow a third party if within Executive's control, to take, any of the foregoing or any reproduction of any of the foregoing. Company property includes without limitation personal property, made or compiled by the Executive, in whole or in part, alone or with others, or in any way coming into the Executive's possession concerning or relating to the Company, the Company Business or other affairs of the Company or any of its affiliates.

**(c)** **Disclosure and Assignment of Rights.**

**(i)** Executive shall promptly disclose and assign, and hereby does assign, to the Company and its affiliates or its nominee(s), to the maximum extent permitted by law, all right, title and interest of the Executive in and to any and all ideas, inventions, discoveries, secret processes, designs, computer codes and methods and improvements, together with any and all copyrights thereto or patents that may be issued thereon in the United States and in all foreign countries which the Executive may invent, develop or improve, or cause to be invented, developed or improved, during the term of this Agreement or which are (x) conceived and developed during normal working hours, and/or (y) which are related to the Company or the Company Business and/or (z) created using any amount of Company's equipment, facilities or Proprietary Information. Any copyrightable work prepared in whole or in part by the Executive relating to the Company or the Company Business shall be deemed a "work made for hire" under the United States copyright laws, and the Company shall own all rights, title and interest therein. As used in this Agreement, the term "invent" includes "make", "discover", "develop", "manufacture" or "produce", or any of them; " invention" includes the phrase "any new or useful original art, machine, methods of manufacture, process, composition of matter, design, or configuration of any kind"; "improvement" includes "discovery" or "production"; and "patent" includes "Letters Patent" and "all the extensions, renewals, modifications, improvements and reissues of such patents".

**(ii)** Executive shall disclose immediately to duly authorized representatives of the Company any ideas, inventions, discoveries, secret process and methods and improvements covered by the provisions of subsection (i) above, and execute all documents reasonably required, and do all things reasonably necessary, in connection with the application for an issuance of Letters Patent in the United States and in any foreign country and the assignment thereof to the Company and its affiliates or its nominee(s). In the event that the Company is unable, after reasonable effort, to secure Executive's signatures on any assignments, Letters Patent, copyrights or other analogous protection relating to any of the foregoing, whether

because of physical or mental incapacity or for any other reason whatsoever, the Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as his agents and attorneys-in-fact, to act for and in his behalf and stead to execute and file any such assignments and applications and to do all other lawfully permitted acts to further the assignment, prosecution and issuance of Letters Patent, copyrights or other analogous protection thereon with the same legal force and effect as if executed by the Executive

**5.3. Rights and Remedies Upon Breach.** If the Executive breaches, or threatens to breach, in any material respect, any of the provisions of Sections 5.1 or 5.2 hereof (collectively, the "**Restrictive Covenants**"), the Company shall, in addition to all its other rights and remedies hereunder, and such other rights and remedies under applicable law and in equity, have the right to seek specific enforcement of the Restrictive Covenants by any court having jurisdiction, including, without limitation, the granting of a preliminary injunction which may be granted without the posting of a bond or other security, it being acknowledged that any such breach or threatened breach may cause irreparable injury to the Company and that monetary damages may not provide an adequate remedy to the Company. If the arbitrator concludes through appropriate proceedings pursuant to Section 16.12 that the Executive has breached any of the covenants contained in Sections 5.1 or 5.2 hereof, the respective restrictive period set forth therein for such Restrictive Covenants shall be extended for a period equal to the period for which Executive is determined by such arbitrator to have been in breach.

**5.4. Severability of Covenants.** If any court of competent jurisdiction determines that any of the Restrictive Covenants, or any part thereof, is invalid or unenforceable, the remainder of the Restrictive Covenants shall not thereby be affected and shall be given full effect, without regard to the invalid portions. If any court of competent jurisdiction construes any of the Restrictive Covenants, or any part thereof, to be unenforceable because of the duration or geographic scope of such provision or otherwise, such provision shall be deemed amended to the minimum extent required to make it enforceable and, in its reduced from, such provision shall then be enforceable and enforced.

## ARTICLE 6
## MISCELLANEOUS

**6.1. Company Actions.** Any action to be taken by the Company hereunder, including without limitation any determinations to be made in its sole discretion and any enforcement of any of its rights (including without limitation the right to terminate), shall be subject to, and pursuant to, the Operating Agreement, including without limitation provisions in the Operating Agreement requiring the Board of Managers, Members, the holders of Preferred Units or the Preferred Unit Managers to approve of, or consent to, certain actions of the Company, or any officer on behalf of the Company.

**6.2. Notices.** Except as specifically provided elsewhere in this Agreement, all notices, requests, consents and statements shall be deemed to have been properly given if (i) hand-delivered, (ii) sent by recognized overnight courier service or (iii) if mailed from within the United States by first class mail, postage prepaid, addressed as follows:

**(a)** If to the Company, addressed to it at:
Attention: Chairman of the Board
Wecounsel Solutions, LLC
100 Cherokee Blvd.
Chattanooga, TN 37405

**(b)** If to the Executive, addressed to the Executive at such address as the Executive shall have filed with the Company for such purpose, or at such other address as the Executive may from time to time specify by giving notice to the Company.

Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, or five (5) days after so mailed.

**6.3. Entire Agreement.** This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto.

**6.4. Waivers and Amendments.** This Agreement may be amended, modified, superseded, canceled, renewed or extended and the terms and conditions hereof may be waived, amended, modified, superseded, canceled, renewed or extended, only pursuant to the Operating Agreement and by a written instrument signed by the Executive and any officer of the Company other than the Executive. No waiver of any provision of this Agreement shall be deemed to be a waiver of any other provision, whether or not similar. No such waiver shall constitute a continuing waiver. No delay on the part of either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of either party of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

**6.5. Assignment.** This Agreement is personal to the Executive, and the Executive's rights and obligations hereunder may not be assigned by the Executive. The Company may assign this Agreement and its rights, together with its obligations, at any time upon reasonable consent of Executive. This Agreement shall inure to the benefit of, and be enforceable by, any purchaser of substantially all of the assets of the Company, any corporate successor to the Company or any other assignee.

**6.6. Counterparts.** This Agreement may be executed in two counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**6.7. Headings.** The article and section headings in this Agreement are for reference purposes only and shall not in any way affect the meaning of interpretation of this Agreement.

**6.8. Number.** Unless the context of this Agreement otherwise requires, words using the singular or plural number will also include the plural or singular number.

**6.9. Governing Law.** This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of the State of Tennessee without giving effect to the principles of conflicts of laws thereof.

**6.10. Expenses.** If any action is necessary to enforce the terms of this Agreement, substantially prevailing party will be entitled to reasonable attorneys' fees, costs and expenses in addition to any other relief to which such prevailing party may be entitled.

**6.11. Withholding.** All sums payable to the Executive hereunder shall be reduced by all federal, state, local and other withholding and similar taxes and payments required by applicable law.

**6.12. Resolution of Disputes, Binding Arbitration.** Except as provided for in this Agreement pertaining to equitable and other injunctive relief, it is the intention and goal of the parties to settle any controversy, claim, or dispute arising under this Agreement (collectively, "dispute") in an amicable and agreeable manner without resort to court litigation by settling the dispute by binding arbitration before a mutually agreed upon single arbitrator in Hartford, Connecticut, and the judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Any party may initiate any arbitration proceeding to settle any dispute by delivering written notice to the other party, provided, however, that with respect to disputes regarding the occurrence of Cause or Good Reason events that are the subject of any termination, the disputing party must deliver such written notice within ten (10) days after its receipt of the applicable notice of termination pursuant to Section 4.4 and Section 4.5(b). If the parties do not agree upon an arbitrator within five (5) days after the written notice initiating such arbitration, they shall submit the dispute for binding arbitration to the American Arbitration Association in Hartford, Connecticut under its Commercial Arbitration Rules. Any issue regarding the arbitrability of a dispute shall be decided by the arbitrator and not by a court. The losing party in the arbitration shall pay the prevailing party's arbitration costs and its attorney's fees reasonably incurred solely in connection with the arbitration.

[Intentionally Left Blank – Signature Page(s) to Follow]

[Signature Page to Executive Employment Agreement]

**IN WITNESS WHEREOF**, the parties have executed this Executive Employment Agreement as of the date first above written.

_____ 08/28/2017
**Sam Johnson**


**WECOUNSEL SOLUTIONS, LLC**

By: _____

Its  Andrew M. Zaback
     Chairman of the Board of Managers