# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION

SAMUEL JOHNSON,                      )
                                     )
    Plaintiff,                   )
                                     )
v.                                   )          NO. 3:21-cv-00656
                                     )
UNIVERSITY HOSPITALS HEALTH          )          JUDGE CAMPBELL
SYSTEM, INC.,                        )          MAGISTRATE JUDGE HOLMES
                                     )
    Defendant.                   )

## MEMORANDUM

Pending before the Court is Defendant University Hospitals Health System, Inc.'s ("UH")

motion for summary judgment (Doc. No. 77), which is fully briefed. (Doc. Nos. 81, 85). For the

reasons discussed below, the motion will be **GRANTED**.

## I. FACTUAL BACKGROUND

Plaintiff Samuel Johnson ("Johnson") brings this suit against UH, a customer of his former

employer, for allegedly demanding his termination. (Doc. No. 1 ¶¶ 7, 31, 72-73, 83, 89, 103, 115,

123). Specifically, Johnson brings state law claims against UH for tortious interference with

employment relations (Count 1) and for common law and statutory tortious inference with

contractual relations (Counts 2-3). (*Id.*).

UH offers Northeast Ohio's largest network of primary care physicians, outpatient centers,

and hospitals. (Doc. No. 14 ¶ 13). UH provides a wide array of healthcare services including

services for lesbian, gay, bisexual, transgender, queer, intersex, and asexual patients, as well as

patients questioning their gender identity. (*Id.* ¶¶ 14, 75). UH has long supported the medical,

emotional, and social needs of such patients. (*Id.*).

Johnson is a citizen and resident of Tennessee. (Doc. No. 1 ¶ 21). He served for several years as the Chief Executive Officer of VisuWell, a company that provides telehealth services to healthcare providers, until his termination on April 26, 2021. (Doc. No. 83 ¶¶ 1-2; Doc. No. 14 ¶ 2). Johnson's employment with VisuWell was subject to a written contract that had no specified duration and permitted termination with or without cause. (Doc. No. 83 ¶ 2).

*Johnson negotiates VisuWell vendor agreement with UH – March 2021*

UH signed a vendor services agreement with VisuWell on or about March 11, 2021. (Doc. No. 83 ¶ 4; Doc. No. 80-15). Johnson worked closely with UH's vice president of digital health solutions, Stacy Porter, in negotiating and closing the deal. (Doc. No. 82-21 at PageID # 1033; Doc. No. 80-14 at PageID # 539). After the agreement was signed, UH and VisuWell published a joint press release announcing VisuWell as UH's principal telehealth software vendor. (Doc. No. 83 ¶ 4; Doc. No. 14 ¶¶ 10, 16, 27). The contract was a boon to VisuWell, as UH became its largest customer in terms of revenue. (Doc. No. 82-9 at PageID # 898).

*Six weeks later – Saturday, April 24, 2021*

In the early evening on Saturday, April 24, 2021, Johnson was at a Franklin, Tennessee hotel restaurant for dinner when he noticed a group of teenagers that included a young man wearing a red dress. (Doc. No. 83 ¶¶ 5-6). Johnson (rightly) assumed the teens were heading to prom. (*Id*. ¶ 6). After Johnson finished his gin and tonic, he left his table to use the restroom. (Johnson Deposition Transcript, Doc. No. 82-2 at PageID # 704, 714-15, 721). Johnson returned to his table by walking through the hotel's courtyard where some of the promgoers were taking pictures. (*Id*. at PageID # 714-15; Doc. No. 80-4 at PageID # 487-88). While passing through the courtyard, Johnson encountered two of the promgoers, one of whom was the young man wearing a red dress. (Doc. No. 83 ¶ 5). Johnson asked the teen why he was wearing a dress and shortly thereafter told

2

the visibly upset teen: "you look like an idiot." (Doc. No. 80-4 at PageID # 488; Doc. No. 82-2 at PageID # 713). The hotel called the police who asked Johnson to leave. (Doc. No. 80-5; Doc. No. 80-2 at PageID # 466). A portion of Johnson's exchange with the teens was captured on video and posted online (the "Video") that night. (Doc. No. 82-1; Doc. No. 83 ¶¶ 7-8).

*Sunday, April 25, 2021*

The next day, members of the public began contacting senior leadership at VisuWell and UH about the Video. (*See* Doc. No. 80-6 at PageID # 496-97; Doc. No. 82-19 at PageID # 1023; *see also* media inquiry to UH about video, Doc. No. 82-20 at PageID # 1029). VisuWell's board of directors also became aware of the Video on Sunday, April 25, 2021. (Doc. No. 83 ¶¶ 8-11; Doc. No. 80-10). At that time, VisuWell had a five-person board of directors comprised of Andy Zaback, Ed Mercadante, Todd Earwood, Karen Pfauer, and Plaintiff Johnson. (Doc. No. 83 ¶ 3). Zaback was the chairman of the board. (*Id*.).

Upon watching the Video, Zaback found it "offensive," while Mercadante and Earwood were concerned about the company's "name being mentioned publicly in a negative light" and about the Video "reflect[ing] poorly on the company." (Doc. No. 83 ¶ 10). That Sunday, Zaback spoke with the three other board members (Mercadante, Earwood, and Pfauer). (*Id*. ¶ 11). According to Zaback, the substance of those conversations was: "what are we going to do, we may have a huge problem on our hands, and is this going to destroy the company, what's the impact on the company." (*Id*.; Doc. No. 80-3 at PageID # 477). That Sunday, members of the board (Mercadante, Earwood, and Pfauer) also discussed reaching out to a crisis management firm for help. (Doc. No. 80-3 at PageID # 477-78).

On Sunday evening, Zaback, Mercadante, and Earwood had a phone call with Johnson. (Doc. No. 80-3 at PageID # 478-79). During the call, the board members conveyed that they were

3

aware of the Video and the attention it was receiving on the internet, asked for Johnson's side of the story, and asked Johnson not to talk to the staff, the press, or any news outlets. (*Id.* at PageID # 479; Doc. No. 82-2 at PageID # 731-33; Doc. No. 82-10 at PageID # 912-14). Later that evening, Earwood sent an email to Zaback and Mercadante with links to social media posts regarding the Video, concluding with: "There are too many to post of our customers being tagged." (Doc. No. 80-10; Doc. No. 83 ¶ 13; *see also* Doc. No. 82-7 at PageID # 838-40; Doc. No. 82-13 at PageID # 965; Doc. No. 82-17 at PageID # 1016-17).

*Monday, April 26, 2021*

By 6:00 a.m. on Monday, April 26, 2021, UH's senior media relations strategist had emailed UH's entire communications and media relations team about the Video, the comments on UH's social media posts about the Video, and preparing a statement for UH. (Doc. No. 82-21 at PageID # 1035). Before 8:00 a.m., UH's vice president of communications, the leader of UH's communications and media relations team, had internally circulated a draft media statement about UH's response to the Video. (Doc. No. 82-20 at PageID # 1028-29).

Around 8:00 a.m., Earwood emailed other VisuWell board members, noting that "[p]eople are commenting on all of VisuWell's social channels about this" and that "[t]he narrative online about Sam is getting painted by comments he's made or posts he's liked about anti-mask, anti-COVID and talking trash to people online. All of this was in the past but it's a bad look for us." (Doc. No. 80-10; Doc. No. 83 ¶ 13).

The VisuWell board met later that morning and began making customer calls afterwards. (Doc. No. 80-34). VisuWell's chief operating officer, Gerry Andrady, and board chairman, Zaback, spoke to all their major customers on Monday and Tuesday. (Doc. No. 82-8 at PageID # 863; Doc. No. 80-3 at PageID # 483; Doc. Nos. 80-17, 80-18, 80-19; Doc. No. 80-20 at PageID #

583). According to Andrady, every customer they spoke with was concerned and "[t]here was universal frustration, disappointment in the incident itself, and essentially insistence that we provide a response quickly…" (Doc. No. 80-6 at PageID # 501).

*VisuWell calls UH*

VisuWell called UH on Monday. (Doc. No. 83 ¶ 15). That phone call occurred at approximately noon eastern time and involved five individuals: Andrady and Zaback from VisuWell and Stacy Porter (UH's vice president of digital health solutions), Dr. Jeffrey Sunshine (UH's chief medical information officer), and Thomas Snowberger (UH's chief administrative officer) from UH. (*Id*.; Doc. No. 80-22 ¶¶ 10-11).[1]

During the call the UH representatives asked what VisuWell's response was going to be to the Video and social media activity resulting from the Video, as well as how VisuWell planned to handle the situation. (Porter Deposition Transcript, Doc. No. 80-14 at PageID # 342-43). According to VisuWell's COO, Andrady:

> A.  What was discussed was – was the video and the – it was asked what the response was going to be to the video.
>
> Q.  The representatives of University Hospitals asked you what your response was going to be?
>
> A.  Yes. They expressed their – as you can see in the e-mail, they expressed their concern and their – their frustration

---

[1] Earlier that morning, VisuWell's account executive for UH, Michael O'Neill, and UH's vice president of digital health solutions, Stacy Porter, exchanged a handful of logistical text messages and a phone call about setting up the noon call for VisuWell and UH. (Doc. No. 83 ¶ 15; Doc. No. 80-33; Doc. No. 80-20 at PageID # 579-80). Also, at 11:19 a.m. eastern time that morning, Sunshine sent an email to O'Neill with the subject "Sam Johnson news," stating:

> I've no idea why I need to reach you rather than other way around.
> Need to hear directly and clearly how VisuWell will be responding to this.
> Speechless, representing your partner here.

(Doc. No. 80-34). O'Neill responded ten minutes later, informing Sunshine that VisuWell's chief operating officer and board chairman (Andrady and Zaback) were beginning to make customer calls and would be calling Porter and Sunshine in fifteen minutes. (*Id*.).

with messages that they were getting on social media in terms of the incident, and that it was affecting – affecting the marketing team and their business, and that – that they are – they were interested in a response as quickly as possible.

Q.      A response from VisuWell?

A.      A response from VisuWell.

Q.      And was there a specific response that was requested by representatives of UH during that call?

A.      There was – there was not a specific response.

*****

A.      I recall that there was a concern that this was representative of our culture, of the VisuWell culture, and that through Sam's leadership this had permeated through our company and that we needed to address that as well.

Q.      And when you say through Sam's leadership, it had permeated through the company, do you recall who made that statement?

A.      I want to be clear. There wasn't a statement made to that effect. That is just my impressions of that conversation, that there was – there was not something quoted word for word, but there was definitely a concern from UH's standpoint that this was a culture problem for the company.

Q.      And when UH asked you for a response on that – on that cultural problem with the company, did they – did they tell you kind of what they wanted to see out of VisuWell?

A.      There – there wasn't – there wasn't a request for a – for what they wanted to see in terms of cultural response. The request was for the official statement.

(Doc. No. 82-9 at PageID # 895-97).

The VisuWell representatives shared on the call that Johnson had been put on paid administrative leave and that VisuWell needed time to investigate and decide what they would do next. (Porter Deposition Transcript, Doc. No. 80-14 at PageID # 543; Doc. No. 83 ¶ 16; Andrady Deposition Transcript, Doc. No. 80-6 at PageID# 500).

6

The UH representatives responded that UH was watching how VisuWell handles the situation and that UH needed to understand what VisuWell's response was going to be because VisuWell's response was going to determine UH's response. (Doc. No. 83 ¶ 16; Zaback Deposition Transcript, Doc. No. 82-8 at PageID # 863; Porter Deposition Transcript, Doc. No. 80-14 at PageID # 543; Andrady Deposition Transcript, Doc. No. 82-9 at PageID # 897, Doc. No. 80-6 at PageID# 499-500). The UH representatives also communicated on the call that UH needed to respond publicly because the behavior they observed on the Video was not aligned with UH's values as an organization. (Porter Deposition Transcript Doc. No. 80-14 at PageID # 544).

The parties agree that the foregoing phone call was UH's last point of contact with VisuWell before VisuWell's board voted to terminate Johnson's employment. (Doc. No. 83 ¶ 15).

*VisuWell's board of directors hires crisis management firm*

At around 12:22 p.m. on Monday, VisuWell's board of directors hired a crisis management firm, the Belfort Group, to advise them "on external communications and customers, how to deal with some of the customers, but mostly how to deal with the external communications." (Doc. No. 80-12 at PageID # 530; Doc. No. 82-8 at PageID # 865). The Belfort Group's recommendation to VisuWell's board "was to get the right message out at the right time and be succinct on your messaging and do not support the behavior that happened." (Doc. No. 82-8 at PageID # 865-66).

*VisuWell's board of directors votes to terminate Johnson's employment*

By 2:57 p.m. eastern time Monday afternoon, VisuWell's board of directors had voted to terminate Johnson's employment for cause under Section 4.3(a) of his employment contract. (Doc. No. 83 ¶¶ 22, 24; Doc. No. 80-30; Doc. No. 80-12; Doc. No. 80-23 at PageID # 599; Doc. No. 80-3 at PageID # 483). After the vote, VisuWell's immediate next steps were "multiple calls with a

7

bunch of the customers." (Doc. No. 82-8 at PageID # 868). A board member circulated the following to the rest of the board as a suggested termination statement:

> Sam,
> Companies are made up of people. Culture is, in part, a reflection of leadership. If health companies of any sort want to do better for those they serve, their leaders need to grapple with the reality of their own ways of thinking and acting. They have to hold themselves accountable and do more, personally and professionally. Social determinants of health are real, and pervasive. The negative impacts of stigma and discrimination have dire consequences for mental health. We have to do better to rid ourselves of hate, stigma and discrimination by shining a light on it, educating each other, and finding ways to do more for those who are consistently persecuted simply for being themselves.
>
> Board members and Gerry have met with numerous customers who are demanding or waiting to hear how we react to this urgent issue.
>
> - Sam you know that you were not fully transparent and forthcoming to us in general.
> - What you did was not what anyone should be doing in general but specifically with kids in this situation, you were the adult here.
> - You did not proactively contact us, we called you last night.
> - Thereafter you were not sincere and forthcoming, for example you had responded to Newsweek but told us otherwise.
> - The board is taking action because we have to respond to our customers and the need to demonstrate the positive culture we should.

(Doc. No. 80-32).

At around 4:36 p.m., Zaback, Mercadante, and Earwood called Johnson and informed him that he had been terminated. (Doc. No. 83 ¶ 22; Doc. No. 80-1).

*VisuWell's board of directors releases public statement and circulates to customers*

With assistance from the crisis management firm, the board released the following public statement:

8

> We unequivocally condemn the behavior exhibited by Sam Johnson in a recent video widely circulated on social media. After investigating the matter and speaking to individuals involved, the VisuWell Board of Directors has chosen to terminate Mr. Johnson from his position as CEO, effective immediately. Gerry Andrady, our President and COO, will lead the company through this important time.
>
> VisuWell's culture emphasizes respect, kindness, and compassion, especially for those from traditionally marginalized communities, and we maintain a zero-tolerance policy for intolerance of any kind. Mr. Johnson's actions contradicted the high standards we set for ourselves in promoting the health of those who use our platform.
>
> We share the concerns that so many have expressed on this matter and look forward to announcing concrete steps we are taking in support of the LGBTQ community in particular over the coming weeks.

(Doc. No. 80-18; Doc. No. 82-8 at PageID # 871-72).

The board emailed the statement to some of VisuWell's customers that evening. (Doc. No. 82-8 at PageID # 871-72; Doc. Nos. 80-17, 80-18, 80-19). VisuWell's chairman, Zaback, called Porter while she was on her way home from work and read VisuWell's public statement to her. (Doc. No. 82-3 at PageID # 774-75; Doc. No. 82-21 at PageID # 1031). Porter expressed UH's appreciation for the swift response and asked Zaback to send her the statement so she could share it with others at UH. (*Id.*). Zaback did not ask for approval of the statement. (Doc. No. 82-3 at PageID # 775).

Porter emailed VisuWell's public statement to UH's vice president of communications, UH's chief administrative officer, and others at 6:10 p.m. eastern time. (Doc. No. 82-21 at PageID # 1031). UH's vice president of communications responded to Porter's email four minutes later stating: "Exactly as expected. Impressive how quickly they were able to execute." (*Id.*). Snowberger, UH's chief administrative officer, replied a minute later stating: "Agree. Right thing

9

to do. I sent to Cliff and Eric for awareness and mentioned we will reconvene the team in the morning for a recommendation." (*Id.*).

*Tuesday, April 27, 2021*

After UH learned that VisuWell terminated Johnson, internal discussion at UH continued regarding the partnership with VisuWell going forward. (Doc. No. 80-22 ¶ 12). Specifically, Porter, Sunshine, and Snowberger were concerned about VisuWell's culture regarding commitment to diversity, equity, and inclusion; VisuWell's treatment of its employees; VisuWell's business conduct; and whether VisuWell was able to carry out its obligations under the vendor contract with UH. (*Id.*). That morning, Porter emailed Zaback and Andrady with a request to speak with them as soon as possible because UH had follow up questions concerning their path forward. (Doc. No. 82-22). Michael O'Neill texted Porter about 15 minutes later stating:

> Morning Stacy. Just saw your email, if your additional clarification is regarding Sam's affiliation with the company – all ties have been severed. He is no longer on the board, not an advisor to the company, or anything along those lines. We're issuing a statement of clarification this morning but wanted to communicate that to you prior so you can get the wheels turning if needed.

(Doc. No. 82-27). Porter texted O'Neill back, stating:

> Thank you. Our other questions are around the plans to ensure that there is a cultural focus on diversity, inclusion and social justice as priorities for the organization going forward. We would like to hear more about those plans and engage as a supportive partner.
>
> Are you planning a press release? I know you made a statement via social media yesterday, but anything more in the works?

(*Id.*). Porter relayed her foregoing communications to Snowberger and advised she was still trying to coordinate the call. (Doc. No. 82-23).

At some point before 12:33 p.m. Tuesday afternoon, Zaback, Andrady, and O'Neill had a phone call with Porter, Snowberger, and Sunshine. (Doc. Nos. 82-24, 80-25). Following the call,

Porter sent the following email to UH's vice president of communications and other UH leadership:

> We just finished a productive call with the VisuWell team and reaffirmed our partnership with them. They confirmed that all ties have been severed with Sam Johnson and that they are actively working toward enhancing their culture around diversity, equity, and inclusion. They will partner with us and perhaps even ask for input along the way. They will be releasing a clarified statement via social media later today regarding Sam's full exit from the company. I made the request that should they do any formal press release on this topic, that they remove our partnership release from their website, as we are getting picked up as the most recent partner. They reaffirmed their plan to honor the technological commitments that Sam had previously made relative to our implementation.
>
> I welcome any additional comments from Tom or Jeff, but it was a positive conversation and they expressed much appreciation for our team and the manner in which we have engaged them during this time.
>
> Thanks to all for your input and counsel to ensure we ended up in the right place for our organization, our community and the patients we serve.

(Doc. No. 82-25).

Snowberger replied to Porter's email less than an hour later, stating:

> Agree. Good discussion and expressed commitment on their part to have a sustainable path forward related to all diversity and inclusion topics. Gary is working on our internal communications which we will be distributing today. thx

(*Id*.). Zaback emailed the board (with the crisis management group copied) the following report of the phone call with UH:

> Gerry, Justin Hoffman (Implementation), Michael O'Neil (Sales) and I had an excellent call with University Hospital's leadership group. Gerry and team did a great job and **University Hospitals reaffirmed their commitment to working with VisuWell.**
>
> They commended the Company for its quick response to the incident and our actions. We opened the meeting by reaffirming that Sam

11

was no longer a part of the company in any way and that was one of
their questions. They wanted to know if Sam had influence on the
organization going forward. They are excited to be our partner and
will be watching what we do on the diversity front going forward.

Overall, a very productive meeting. University has a high regard for
our team, Justin and Michael in particular.

(Doc. No. 82-24) (emphasis in original).

At 3:25 p.m., Snowberger emailed UH's CEO a draft internal communication regarding

VisuWell along with the following message:

Attached is a proposed communication regarding the VisuWell
situation. Our internal team close to the relationship support
maintaining the business partnership in light of VisuWell's board
decision to terminate the CEO's employment. Stacy Porter, Jeff
Sunshine and myself spoke directly to their chair today and their
leadership team who made it clear to us they will make other
changes to ensure their commitment to DE&I are realized. Wanted
your perspective and to make sure you are in alignment with the
recommendation before releasing the internal message. Thx Tom

(Doc. No. 82-26).

Roughly an hour later, at 4:30 p.m., UH's CEO sent the following internal email:

University Hospitals does not tolerate discrimination or harassment
in any form by our caregivers *or by the vendors who work with us*.
A situation came to our attention this week involving the Chief
Executive Officer for VisuWell, the vendor recently selected for
development of our next-generation telehealth platform.

An event captured on video and posted to social media runs counter
to our UH commitment to diversity and inclusion. We acted
immediately to express our concerns by reaching out to the Chair of
the VisuWell Board. Within hours, VisuWell had issued the
following statement:

*"We unequivocally condemn the behavior exhibited by Sam Johnson
in a recent video widely circulated on social media. After
investigating the matter and speaking to individuals involved, the
VisuWell Board of Directors has chosen to terminate Mr. Johnson
from his position as CEO, effective immediately. Gerry Andrady,*

12

our President and COO, will lead the company through this
important time.

"VisuWell's culture emphasizes respect, kindness, and compassion,
especially for those from traditionally marginalized communities,
and we maintain a zero-tolerance policy for intolerance of any kind.
Mr. Johnson's actions contradicted the high standards we set for
ourselves in promoting the health of those who use our platform.

"We share the concerns that so many have expressed on this matter
and look forward to announcing concrete steps we are taking in
support of the LGBTQ community in particular over the coming
weeks."

A team of UH leaders involved in working with VisuWell on the
advancement of our telehealth capabilities has assessed their
response and was prepared to terminate our agreement had their
leadership not stepped up to do the right thing. We will continue to
monitor their follow through on the commitments they have made
to further a culture of diversity and inclusion that we expect in all of
our business relationships.

Th incident involving the VisuWell CEO illustrates how individual
actions outside the workplace by our people and vendors can reflect
on the character of our organization. UH received several comments
from concerned caregivers and patients who were aware of the
social media posts and our recent agreement with VisuWell.

We continue to count on your leadership to help assure that UH is a
welcoming place for all of us, our patients and colleagues.

(Doc. No. 80-28 at PageID # 623-24) (emphasis in original).

UH's Interim Executive Director of the Office of Community Impact, Equity, Diversity &

Inclusion replied to the email ten minutes later stating:

YES! Thank you for your leadership and communication on this,
Cliff and Tom.

This was the right response by VisuWell and by us to be prepared to
sever our relationship had they not addressed this appropriately. Our
LGBQTIA+ community deserves to be seen and supported.

(Doc. No. 80-28 at PageID # 622).

13

UH's CEO replied to the foregoing email five minutes later:

> No question where were going. Good news is that we had a conversation at noon yesterday with the chairman of their board and told him that if we didn't hear is gone (publicly) by the end of the day yesterday that we were severing ties. They tweeted last evening and Obviously they did the right thing here
>
> No place for this kind of behavior C

(Doc. No. 80-28 at PageID # 622).

At 6:35 p.m., UH tweeted:

> University Hospitals does not tolerate discrimination or harassment in any form by our caregivers or by the vendors who work with us. We acted immediately to express our concerns to the Chair of the VisuWell Board. Within hours, VisuWell advised us that they had terminated Mr. Johnson from his position as CEO and pledged to take concrete steps in support of the LGBTQIA+ community in particular over the coming weeks. UH was prepared to terminate our agreement with VisuWell had their leadership not stepped up to do the right thing. We will continue to monitor their follow through on their commitment to further a culture of diversity and inclusion that we expect in all of our business relationships.

(Doc. No. 80-27).

On August 24, 2021, less than six months after his termination, Johnson filed the present suit against UH. (Doc. No. 1). On November 30, 2023, UH filed the pending motion for summary judgment. (Doc. No. 77). In support of its motion, UH filed 35 exhibits, which comprised of: emails, text messages, board member notes, twitter posts, the vendor agreement between UH and VisuWell, Johnson's employment contract with VisuWell, Johnson's confidential settlement agreement with VisuWell, and sworn testimony from Johnson, VisuWell's board members (Zaback, Mercadante, Earwood), VisuWell's president and COO (Andrady), the UH representatives on the April 26 phone call (Porter, Snowberger, Sunshine), UH's CEO (Cliff Megerian), and UH's vice president of communications (Gary Christy). (*See* Doc. No. 80).

14

Johnson filed 28 exhibits in support of his response, which comprised of: the Video, emails, text messages, UH's LBTBQ+ and GenderCare business plan from December 2020, and sworn testimony from the same individuals as UH as well as from his wife and son, UH's vice president of digital marketing (Matthew Eaves), UH's social media manager (Robert Batyko), and UH's 30(b)(6) representative (Sonia Salvino). (*See* Doc. No. 82).

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case.  *Id*.

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party.  *Bible Believers v. Wayne Cty., Mich*., 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).  The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question.  *Id*. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary

judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

### III. LAW AND ANALYSIS

#### A. Tortious interference with employment relations (Count 1)

"The essential elements of a claim for intentional interference with employment are 'that the defendant intentionally and without justification procured the discharge of the employee in question.'" *Thompson v. Memphis Light, Gas & Water*, 416 S.W.3d 402, 413 (Tenn. Ct. App. 2011) (quoting *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977)).

Through its pending motion for summary judgment, UH argues Johnson cannot show that it procured his discharge because the only UH representatives in contact with VisuWell on April 26, 2021, each testified that they did not expressly or otherwise communicate to VisuWell that: (1) VisuWell should terminate Johnson and/or that (2) UH was prepared to sever ties with VisuWell if Johnson was not terminated. (Doc. No. 78 at PageID # 418-23; Doc. No. 83 ¶¶ 17-19 (citing Porter Deposition Transcript, Doc. No. 80-14 at PageID # 544-47; Sunshine Affidavit, Doc. No. 80-22 ¶¶ 10-11; Snowberger Deposition Transcript, Doc. No. 80-21 at PageID # 587-91)).

Additionally, UH argues Johnson cannot show that it procured his discharge because the only VisuWell representatives who had contact with UH on April 26, 2021, each testified that they did not believe that: (1) UH made a demand that VisuWell fire Johnson or that (2) UH threatened to terminate its vendor agreement with VisuWell if Johnson was not fired. (Doc. No. 83 ¶¶ 17-18 (citing O'Neill Deposition Transcript, Doc. No. 80-20 at PageID # 582; Zaback Deposition Transcript, Doc. No. 80-3 at PageID # 480; Andrady Deposition Transcript, Doc. No. 80-6 at PageID # 499-500)).

16

In his response, Johnson argues an internal UH email and tweet from Tuesday, April 27, 2021, the day *after* VisuWell's board voted to terminate Johnson's employment, create a genuine dispute of material fact as to whether UH procured his termination.[2]

Johnson submits that the internal email from UH's CEO on April 27 raises a material dispute of fact as to whether a UH representative communicated a threat of contract termination to VisuWell during the April 26 phone call because "CEOs often communicate their wishes through subordinates." (Doc. No. 81 at PageID # 677 (citing Doc. No. 80-28 at PageID # 622). While it is true that CEOs often communicate through their subordinates, here, UH's CEO testified that he neither instructed anyone to communicate anything to VisuWell nor spoke with anyone at UH

---

[2]     The email at issue was sent by UH's CEO, stating:

> No question where were going. Good news is that we had a conversation at noon yesterday with the chairman of their board and told him that if we didn't hear is gone (publicly) by the end of the day yesterday that we were severing ties. They tweeted last evening and Obviously they did the right thing here

(Doc. No. 80-28 at PageID # 622).

The tweet at issue was posted by UH at 6:35 p.m. on Tuesday, April 27, 2021, stating:

> University Hospitals does not tolerate discrimination or harassment in any form by our caregivers or by the vendors who work with us. We acted immediately to express our concerns to the Chair of the VisuWell Board. Within hours, VisuWell advised us that they had terminated Mr. Johnson from his position as CEO and pledged to take concrete steps in support of the LGBTQIA+ community in particular over the coming weeks. UH was prepared to terminate our agreement with VisuWell had their leadership not stepped up to do the right thing. We will continue to monitor their follow through on their commitment to further a culture of diversity and inclusion that we expect in all of our business relationships.

(Doc. No. 80-27). Johnson claims the foregoing tweet supports his claims for inducement of breach of contract (Counts 2 and 3), arguing the tweet is evidence that UH used Johnson's termination as a marketing opportunity for its LGBTQ+ medical services. (*See* Doc. No. 81 at PageID # 679 (citing *Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 640 (M.D. Tenn. 2006) ("liability for inducement of breach of contract may be imposed if the inducer's motive was simply to benefit himself, with the indirect effect of damaging the plaintiff. Consequently, business competition is no defense to a claim for inducement of breach of an existing contract."))).

about what was discussed with VisuWell during the call. (Doc. No. 80-26 at PageID # 611-12, 614).[3] Moreover, UH's CEO denied having any personal knowledge of the situation entirely:

> Q.    Dr. Megerian, in April of 2021, what was your primary focus at that time as CEO of University Hospitals?
>
> A.    We were just getting over the delta version of the COVID, and we were selected by the governor to lead the city of Cleveland vaccination efforts. So it was pretty much 24/7 activities around dealing with the COVID sick but then vaccinating about eight thousand a day in the Wolstein Center here at Cleveland State. So we had – it was 24/7 activity around hospital incident command – hospital incident command around COVID and mainly the vaccination process, which was new.
>
> Q.    And relatively speaking, where would an issue involving the CEO of a vendor rank in terms of priority at that time in April of 2021?
>
> A.    For me?
>
> Q.    Yes.
>
> A.    It didn't rank. This was not on my radar screen.

(Doc. No. 80-26 at PageID # 610-11).

When asked about the content of the email at issue despite not having participated in or having personal knowledge of the Monday call, the CEO testified:

> A.    Well, I think I was making some assumptions. I didn't have prima facie knowledge of the details. I assumed based on the message going out to the Team of Teams and the message from VisuWell, and I made an assumption about what had

---

[3]    While Johnson appears to suggest that the CEO's statements in the April 27 email are his recollections about what happened the day before, he fails to direct the Court to any evidence that the CEO had knowledge of the VisuWell phone call before it took place. (*See* Doc. No. 81 at 676-77 ("UH also asserts that statements made after the decision to terminate do not count to 'create a genuine issue of material fact.' This claim makes no sense; the recollections of witnesses are highly relevant. For instance, when UH's CEO stated, in an email after the termination, that UH demanded a public statement that Johnson 'is gone,' and that UH made this demand prior to the VisuWell board meeting, then that email, even coming the next day, is highly relevant to show what happened on the day before.") (internal citations omitted)).

18

transpired in terms of the conversation … [b]ut I didn't have any direct knowledge[.] … So it was an assumption on my part of the details and the facts of what had transpired.

Q.      And, again, just for clarity, you were not on any phone call with UH representatives and the VisuWell board chair in the days surrounding this incident?

A.      No. No.

Q.      And you did not instruct anyone at UH to convey anything in particular to the VisuWell board chair?

A.      No. No.

Q.      And you don't know what was said on that call between UH representatives and the VisuWell board chair?

A.      I don't know.

Q.      So it's your testimony today that it was an assumption that UH had a call with the chairman of the VisuWell board?

A.      No. I think it was an assumption as to the conversation. …

Q.      So it's your testimony that you never spoke with Snowberger regarding the substance of the phone call with chairman of the VisuWell board?

A.      That's exactly right. I digested the e-mail that I think you showed me earlier … as being the outcome of that, but I had no direct knowledge of the details of the conversation.

Q.      So it was an assumption that if Mr. Johnson was not terminated by VisuWell, that UH would have severed ties; is that correct?
…

A.      No, I don't know what the team was going to do. Again, that was an assumption of the past, I don't know how many hours it was, forty-eight hours, but, again, I was not directly involved nor directed the strategy, details of the conversation, nor a goal of an outcome of – and I'm not still even today aware of who were the parties from our team who were involved in the conversation with the VisuWell board. And I think I made an assumption based on the outcome and the statement by VisuWell that – as to what had transpired.

19

(Doc. No. 80-26 at PageID # 613-15; Doc. No. 82-6 at PageID # 816-17).

Even if UH thought Johnson's termination was "the right thing" for VisuWell to do and/or had been prepared to sever it business relationship with VisuWell if they were not satisfied with its response, Porter, Sunshine, and Snowberger each testified that no such message was conveyed to VisuWell during the April 26 noon phone call or any other time before Johnson's termination. (Doc. No. 83 ¶¶ 17-19 (citing Porter Deposition Transcript, Doc. No. 80-14 at PageID # 544-47; Sunshine Affidavit, Doc. No. 80-22 ¶¶ 10-11; Snowberger Deposition Transcript, Doc. No. 80-21 at PageID # 587-91); *see also* Porter Deposition Transcript, Doc. No. 82-3 at PageID # 763-65). Indeed, Johnson fails to direct the Court to evidence in the record showing that Porter, Sunshine, or Snowberger ever uttered the phrases "do the right thing" or "the right thing to do" to Zaback, Andrady, O'Neill, or anyone else at VisuWell on April 26. (*See* Doc. No. 81 at PageID # 665-68, 674-77).

And, perhaps more importantly, all the VisuWell representatives who had contact with UH before Johnson's termination on April 26, 2021, each testified that they did not believe that: (1) UH made a demand that VisuWell fire Johnson or that (2) UH threatened to terminate its vendor agreement with VisuWell if Johnson was not fired. (Doc. No. 83 ¶¶ 17-18 (citing O'Neill Deposition Transcript, Doc. No. 80-20 at PageID # 582; Zaback Deposition Transcript, Doc. No. 80-3 at PageID # 480; Andrady Deposition Transcript, Doc. No. 80-6 at PageID # 499-500)). Rather, the evidence in the record reflects that VisuWell's understanding from the noon call was that UH wanted VisuWell to make an official statement that afternoon. (Andrady Deposition Transcript Doc. No. 82-9 at PageID # 896-97).

Even viewing the facts in the light most favorable to Johnson and drawing all reasonable inferences in his favor, no reasonable juror could find that UH demanded that VisuWell terminate

Johnson's employment and/or threatened VisuWell with contract termination if Johnson was not terminated. As Johnson has failed to direct the Court to evidence in the record demonstrating a genuine dispute of material fact as to whether UH procured his termination from VisuWell, UH's motion for summary judgment will be **GRANTED** as to Count 1.

**B. Tortious interference with contract (Counts 2-3)**

"In Tennessee, the common law action for tortious interference with contract and the statutory action for unlawful procurement of breach of contract have the same elements and operate as alternative theories of recovery." *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 832 (E.D. Tenn. 2005) (citations omitted). The elements for either cause of action are: (1) a legal contract existed; (2) the defendants knew the contract existed; (3) the defendants intended to induce a breach of that contract; (4) the defendants acted with malice; (5) the contract was breached; (6) the defendants' actions were the proximate cause of the breach; and (7) the plaintiff suffered damages. *See HCTec Partners, LLC v. Crawford*, 676 S.W.3d 619, 641 (Tenn. Ct. App. 2022).

UH moves for summary judgment on Johnson's tortious interference with contract claims on the basis that he has no evidence to support the third, fourth, fifth, and sixth elements. (Doc. No. 78 at PageID # 424-33). Evening assuming Johnson has proof of the other elements, UH has demonstrated the absence of evidence for the fifth essential element of both claims – breach of Johnson's employment contract. (*See id*. at PageID # 428-29 (citing Doc. Nos. 80-30, 80-1, 80-31); Doc. No. 85 at PageID #1086). The parties agree that VisuWell terminated Johnson's employment for cause under Section 4.3(a) of his employment contract. (Doc. No. 83 ¶ 24). Moreover, Johnson agrees that VisuWell "had a contractual right to terminate [him]" for any reason or no reason at all. (*See* Doc. No. 81 at PageID # 682; Doc. No. 83 ¶ 2). Accordingly, UH's motion will also be **GRANTED** as to these Counts.

An appropriate order will enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE